**SECOND DIVISION**
**BARNES, P. J.,**
**ADAMS and MCFADDEN, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/

June 26, 2012

# In the Court of Appeals of Georgia

A12A0459. HAWKINS v. THE STATE.
A12A0460. WOODS v. THE STATE.

MCFADDEN, Judge.

Skylar Hawkins and Octavious Woods were convicted of three counts of armed robbery and possession of a firearm during the commission of a crime for robbing a waitress, a cook and a customer at a Waffle House. Both Hawkins and Woods argue that they were entitled to a mistrial because of certain testimony of an investigator, but we find that by instructing the jury to disregard the testimony, the trial court provided a sufficient remedy. Hawkins also argues that the trial court erred by limiting his cross-examination of the investigator for bias. We find, however, that any error in this regard was harmless. Hawkins argues that the testimony about his drug use impermissibly placed his character in issue, but the evidence was admissible as

part of the res gestae of the crime. Woods argues that the trial court erred by admitting his statement to an investigator. We find that the trial court correctly determined that Woods had waived his *Miranda* rights. Finally, Woods argues that he was entitled to a mistrial because of the state's violation of the rule of sequestration, but assuming such a violation occurred, the proper remedy was not a mistrial but instead was an instruction to the jury to consider the violation when assessing witness credibility. For these reasons, we affirm Hawkins's and Woods's convictions.

1.     Viewed in the light most favorable to the jury's verdict, *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979), the record shows the following relevant facts. On the evening of February 25, 2008, Hawkins, Woods, Logan White and Cordell Ward met at Hawkins's residence. The men discussed committing a robbery, and White left for 10 or 15 minutes to get a gun. Eventually, they drove to a Waffle House in White's Nissan pickup truck. Around 1:30 a.m., a customer went to the same Waffle House. When he arrived, he saw three men sitting in a booth, eating. Two Waffle House employees, a cook and a waitress, were also present. The three men paid for their food and exited the restaurant. The customer

2

noticed that they went to the parking lot and stood around a Nissan truck with its hood raised.

About ten minutes later, the three men re-entered the restaurant. Logan White, one of the three men, pulled out a handgun and cocked it. He jumped on the counter, pointed the gun at the waitress, and demanded money from the cash register. The waitress complied. After taking money from the register, White pointed the gun at the cook, demanded his money and took his wallet. Octavious Woods, another of the three men, demanded money from the customer and began poking him with a crowbar. White pointed the gun at the customer, and Woods took $98 from his pocket. White and Woods forced the three victims to lie on the floor. While White and Woods were robbing the victims, the third man, Cordell Ward, stood at the front door of the restaurant, blocking the door. After robbing the three victims, the men ran to the pickup truck, jumped into its bed, and Hawkins drove off.

The cook called the police and described the robbers' truck and their direction of travel. Within moments of the call, a Douglas County sheriff's deputy spotted the truck and pursued it. The driver, Hawkins, refused to pull over, and the deputy forcibly stopped the truck. Hawkins surrendered, but the three men who had been in the bed of the truck fled on foot. A deputy chased and caught Woods. When Woods

3

was booked, the officers found $98 in cash in his shoe, the same amount that was stolen from the customer. White was also captured a short distance away. The deputies recovered the cook's wallet from White's pocket and a large amount of cash from some bushes where White had hidden it. Officers searched the truck and found a handgun and a crowbar, items that the customer identified at trial as the weapons used during the robberies. Although he managed to escape that night, Ward was arrested at home the next day.

Prior to the trial of Ward, Woods and Hawkins, White pled guilty to armed robbery and agreed to testify against his co-defendants. White identified the loaded gun recovered from his truck as the weapon used in the armed robberies. He testified that he told his co-defendants earlier in the evening that he wanted to commit a robbery and that they all knew that he had a gun. He testified that he and the other men discussed robbing the Waffle House after they finished eating and were in the parking lot. The evidence is sufficient to support the convictions of Hawkins and Woods under *Jackson v. Virginia*.[1] See *Skipper v. State*, __ Ga. App. __, __ (1) (__ SE2d __) (Case No. A11A1912, decided March 16, 2012) (evidence that defendant

---

[1]We affirmed Ward's convictions for three counts of armed robbery and possession of a firearm during the commission of a felony in an unpublished opinion. *Ward v. State*, __ Ga. App. __ (Case No. A11A1408, decided Aug. 15, 2011).

4

discussed attempted armed robbery beforehand with the other men, provided part of a disguise, drove the co-defendants to the crime scene, was present near the scene of the attempted robbery, fled the scene after the attempted robbery, and changed her story about the details of the night of the attempted robbery supported conviction for being a party to the attempted armed robbery).

2.     Both Hawkins and Woods argue that the testimony of Cindy Ash, an investigator with the Douglas County District Attorney's Office, put their characters in issue. Hawkins also argues that the trial court erred by limiting his cross-examination of Ash.

At one point in the trial, defense counsel informed the court outside the jury's presence that during defendant Cordell Ward's testimony, Ash, who was seated among the spectators, had pointed at and threatened a family member of Ward's and Hawkins's who was also watching the trial. The judge acknowledged that he had seen Ash point her finger. He instructed the assistant district attorney to require Ash to remain outside the courtroom because she was "get[ting] into it" with a witness's family. The judge said that Ash needed "to stay a little more dispassionate. [He] understood her desire to help, but sometimes it was getting a little bit overwrought."

Later, the assistant district attorney called Ash as a witness to rebut Ward's testimony that he did not know who picked him up after he jumped from the bed of the truck and fled from the police. Ash testified that she had been present in the courtroom during Ward's testimony. She testified that when the assistant district attorney asked Ward who picked him up, a man sitting in front of her, Terell Caldwell, commented that he had picked up Ward that night.

On cross-examination, Hawkins's attorney asked Ash whether it was true that she had become very upset during the trial and had approached him to say "your friend's making motions or signs or doing some kind of communication with one of the defendants up here." Although Ash denied being upset, she admitted that she had approached counsel who said he would take care of it. Counsel then asked her whether it were true that the judge had ordered her out of the courtroom during the trial. The state objected on the ground that the issue was irrelevant, and the court sustained the objection. Defense counsel argued that the evidence was "relevant because it [went] to her interactions with the family members and particularly Terell Caldwell." He argued that Ash had had "certain interactions with this family" that were relevant to her credibility. The court reiterated that the evidence was irrelevant,

and counsel continued his cross-examination of Ash. He asked Ash whether she had been sitting next to family members and Caldwell all week, and Ash responded,

> No, sir. I was on the back row and they were -- and I wasn't sitting next to the family members except for the lady -- I'm not sure who she is that's with Terell. She was sitting most of the time next to him, and I have always sat in the back row. And in regards to your question before, they were shooting gang signs back and forth to each other. They were disrupting –

All three defendants immediately objected and moved for mistrial. Although the judge denied the defendants' motions for mistrial, he instructed the jury to disregard Ash's statement. Ash was excused and gave no more testimony.

(a)    Hawkins argues that the trial court erred by restricting his cross-examination of Ash, who, he claims, had crossed the line from being a witness to being an advocate. "The state of a witness's feelings toward the parties and his relationship to them may always be proved for the consideration of the jury, and a defendant has the right to make a thorough and sifting cross-examination of the witnesses against him." (Citations and punctuation omitted.) *Miceli v. State*, 308 Ga. App. 225, 227 (2) (707 SE2d 141) (2011). See also OCGA § 24-9-68. However,

> the constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, like other Confrontation Clause errors, is

7

subject to . . . harmless-error analysis. The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness'[s] testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Delaware v. Van Arsdall*, 475 U. S. 673, 684 (106 SC 1431, 89 LE2d 674) (1986). See also *Smith v. State*, 284 Ga. 599, 609 (4) n. 21 (669 SE2d 98) (2008) (violation of right to confrontation can be deemed harmless if the record on the whole shows it harmless beyond a reasonable doubt.).

Pretermitting whether the trial court erred by limiting the cross-examination of Ash, any error was harmless beyond a reasonable doubt. Ash was a minor witness, who testified to only one fact related to the armed robbery: that Terell Caldwell said that he had picked up Ward when Ward testified he did not know who picked him up. Ash gave no testimony that implicated Hawkins or contradicted his testimony. Ash's testimony was of negligible importance to the state's case, which overall was very

8

strong, and we have no trouble concluding that any error was harmless beyond a reasonable doubt. Compare *Brown v. Baskin*, 286 Ga. 681, 685-686 (690 SE2d 822) (2010).

(b)     Hawkins and Woods argue that the trial court should have granted a mistrial because of Ash's reference to gang signs. Although the trial court denied the defendants' motions for mistrial, the court instructed the jurors to disregard Ash's reference to gang signs. "A trial court's discretion in granting or refusing to grant a mistrial should not be disturbed unless a mistrial is essential to the preservation of the right to a fair trial." *Gardner v. State*, 273 Ga. 809, 812-813 (5) (546 SE2d 490) (2001). "Considering the nature of [Ash's] statement, [the fact that it did not implicate Hawkins or Woods in gang activity], the other evidence in the case, and the action taken by the court and counsel concerning the impropriety," we find that Hawkins and Woods were not denied the right to a fair trial. *Ramirez v. State*, 279 Ga. 569, 576 (9) (619 SE2d 668) (2005). Consequently, the trial court did not err in denying their motions for mistrial. *Gardner*, supra.

2.     Hawkins argues that the trial court erred by allowing the state to introduce evidence that he had used cocaine and marijuana before the robbery. White testified that the evening of the crime, he had used marijuana and cocaine, and he

remembered the defendants smoking marijuana in the truck. Hawkins argues that this testimony was not relevant, given the trial court's earlier ruling that Hawkins's statement was admissible, a ruling which necessarily included a finding that Hawkins was not intoxicated at the time he gave his statement. Given this ruling, Hawkins argues, the only reason for introducing evidence of his marijuana use was to place his character in evidence.

> Evidence is not inadmissible simply because it might incidentally reflect on the defendant's character. . . . What is forbidden is the introduction by the state in the first instance of evidence whose sole relevance to the crime charged is that it tends to show that the defendant has bad character. [White's] testimony he and [Hawkins] used drugs . . . on the day of the [crime] was relevant evidence of [Hawkins's] state of mind and admissible as part of the res gestae. Whether the effects due to their use may have worn off by the time of the [crime] was a question for the jury to decide.

(Citations, punctuation and emphasis omitted.) *Pless v. State*, 260 Ga. 96, 98 (2) (390 SE2d 40) (1990).

3. Woods argues that the trial court erred in admitting his custodial statement. Before trial, the court conducted a *Jackson v. Denno*, 378 U. S. 368 (84 SC 1774, 12 LE2d 908) (1964), hearing at which an investigator testified. The

10

investigator testified that when he first read Woods his *Miranda* rights, see *Miranda v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966), Woods asked for an attorney, so the investigator ended the interview. The next day, the investigator received a letter from Woods stating that, "I want to speak with Investigator Hayes in reference to my case." In response, the investigator met with Woods at the jail. The investigator again read him his *Miranda* rights, and when the investigator asked whether Woods wanted to talk to him without a lawyer, Woods explained that he wanted his mother to be present. The investigator asked whether the mother was an attorney. Woods answered that she was a private investigator. The investigator asked whether she was his attorney, and Woods responded that he did not know. The investigator explained that if the mother were Woods's attorney "we'll have her come up here." If she wasn't his attorney, they could try to arrange a conference call. But they would first have to "clear up the *Miranda* rights." The investigator asked Woods if he understood his *Miranda* rights, "clarif[ying] each of the individual rights that he waived." Woods answered yes, signed a rights waiver form, and gave a statement. The trial court concluded that Woods freely and voluntarily gave his statement after knowingly waiving his rights. We accept the trial court's factual and credibility

11

findings following a *Jackson v. Denno* hearing unless they are clearly erroneous. *Bright v. State*, 265 Ga. 265, 280 (5) (b) (455 SE2d 37) (1995).

Woods argues that the investigator's testimony demonstrates that Woods did not waive his right to have an attorney present during his interview.

> In order for a suspect to properly invoke his right to counsel during a custodial interrogation, he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. Invocation of the *Miranda* right to counsel requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney. But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning.

(Citations and punctuation omitted.) *Robinson v. State*, 286 Ga. 42, 43-44 (684 SE2d 863) (2009). Because a reasonable officer would not necessarily have understood Woods's answer that he did not know whether his mother was his lawyer to be a clear request for counsel, the investigator was not required to end the interview on that basis. *Fitz v. State*, 275 Ga. 349, 353 (3) (b) (566 SE2d 668) (2002). The

12

investigator's further questioning and explanation of Woods's *Miranda* rights confirmed Woods's desire to talk without an attorney being present. *Id.* By administering *Miranda* warnings after Woods answered that he did not know whether his mother was his attorney, reviewing the waiver of rights form and obtaining Wood's signature, the investigator resolved any possible ambiguity that may have been created by Woods's statement. *Jordan v. State*, 267 Ga. 442, 445 (1) (480 SE2d 18) (1997). The trial court did not err in admitting Woods's statement.

4. Woods argues that the trial court erred by denying his motion for mistrial when the assistant district attorney violated the rule of sequestration by informing White about the testimony of other witnesses. On cross-examination, Woods's counsel asked White whether he remembered the assistant district attorney telling him "what the story was to the jury already," and "what the evidence of all three attorneys was to the jury already." White answered affirmatively.

After a lunch recess, Woods moved for a mistrial on the grounds of prosecutorial misconduct, specifically because the assistant district attorney had told White the substance of other witnesses' testimony. The trial court denied the motion, concluding that, based on White's responses, the assistant district attorney was simply "trying to figure out what his testimony [was] going to be."

13

Pretermitting whether the assistant district attorney violated the rule of sequestration, the trial court did not err by denying the motion for mistrial.

> When the rule of sequestration is violated, the violation goes to the credibility rather than the admissibility of the witness'[s] testimony. A party's remedy for a violation of the rule is to request the trial court to charge the jury that the violation should be considered in determining the weight and credit to be given the testimony of the witness.

(Citation omitted.) *Aalon v. State*, 247 Ga. App. 37, 40 (2) (543 SE2d 78) (2000). "[A] violation of the rule goes only to credibility, not admissibility, and the proper remedy is not a mistrial." *Glass v. State*, 289 Ga. 542, 548 (6) (c) (712 SE2d 851) (2011).

*Judgments affirmed. Barnes, P. J., and Adams, J., concur.*